CARNEY WILLIAMS BATES
PULLIAM & BOWMAN, PLLC
Hank Bates (Ca. # 167688)
hbates@carneywilliams.com
11311 Arcade Drive, Suite 200
Little Rock, Arkansas 72212
Tel: 501-312-8500

MILSTEIN ADELMAN, LLP
Gillian L. Wade, State Bar No. 229124
gwade@milsteinadelman.com
M. Isaac Miller, State Bar No. 266459
imiller@milsteinadelman.com
2800 Donald Douglas Loop North
Santa Monica, CA 90405
Tel: 310-396-9600

Attorney for Plaintiffs Benjamin
Bell and Christopher Spellman, on
behalf of themselves and all others
similarly situated

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

# CV12-09475 SVW (PJW x)

| | |
|---|---|
| BENJAMIN BELL and CHRISTOPHER SPELLMAN, | Case No.: |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| vs. | **JURY TRIAL DEMANDED** |
| BLIZZARD ENTERTAINMENT, INC., a Delaware corp., and ACTIVISION BLIZZARD, INC., a Delaware corp. | |
| Defendants | |

# COMPLAINT

Come now the Plaintiffs, Benjamin Bell and Christopher Spellman ("Plaintiffs"), acting individually and on behalf of all other persons similarly situated, and for their Complaint and demand for jury trial state and allege as follows:

# INTRODUCTION

1.     Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(l), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons throughout the nation who were deceptively and unfairly sold video game products by Defendants, only to learn after the point of sale that they must purchase additional products from Defendants in order to have even minimal protection for their sensitive personal, private, and financial data ("Private Information"); and whose Private Information was negligently, deliberately, and/or recklessly allowed to be stolen from Blizzard Entertainment and Activision Blizzard ("Defendants").   Plaintiffs' claims relate to, and arise from, acts of theft, invasion of privacy, and unauthorized use. Plaintiffs seek injunctive relief, compensatory damages, restitution, disgorgement, and recovery of attorneys' fees and litigation costs.

2.     Specifically, Plaintiffs assert that (1) Defendants have failed to take the necessary measures to secure the Private Information of their customers, as stored on a website owned and administered by Defendants; (2) as a result of this deficient security, Defendants' website has suffered multiple instances of theft of the Private Information of its customers; and (3) Defendants have added extra, hidden, post-sale costs onto their products, namely in the form of auxiliary security devices that customers must purchase to ensure the sanctity of their Private Information when using Defendants' products.

3.     Defendants are video game manufacturers whose business model is premised on the collection and storage of the Private Information of their customers, via a website called Battle.net.  Defendants negligently, deliberately, and/or recklessly fail to ensure that adequate, reasonable procedures safeguard the Private Information

1

stored on this website. As a result of these acts, the Private Information of Plaintiffs and Class members has been compromised and/or stolen since at least 2007. Most recently, on or about May 19, 2012, reports proliferated that Class members' Battle.net accounts had suffered a security breach ("hack") at the hands of unknown parties ("hackers"), and on or about August 4, 2012, hackers massively breached Battle.net's security and acquired the Private Information of all of Defendants' customers in the United States, as well as the remainder of North America, Latin America, Australia, New Zealand, and Southeast Asia.

4.     In the wake of the hack occurring on or about August 4, 2012, Defendants have not taken the legally required steps to alert Plaintiffs and Class members of the very existence of the hack, and thus have actively impaired Plaintiffs and Class members from taking any meaningful steps to protect their Private Information on their own.

5.     Defendants' acts have not only harmed Plaintiffs and Class members by subjecting their Private Information to hackers, they have harmed Plaintiffs and Class members by devaluing their video games – purchased from Defendants under certain assurances of security – by adding elements of risk to each and every act of playing said games.

6.     Moreover, rather than shouldering the burden of adopting sufficient security measures to prevent these repeated hacks and to protect the Private Information of their customers, Defendants instead have informed their customers, after the point of sale, that they must purchase additional security products in order to ensure the sanctity of their Private Information. These additional, post-purchase costs for security products – which Defendants assert are the only measures that may be taken to ensure something even approximating account security when playing their video games – were not disclosed to Plaintiffs and Class members prior to the purchase of Defendants' products.

7.     Defendants' actions constitute violations of multiple consumer protection

2

1  statutes, and subject Defendants to additional liability under common law theories of
2  negligence, breach of contract and unjust enrichment.

3      8.     Plaintiffs seek damages suffered as a result of Defendants' practices,
4  including, but not limited to, compensatory damages and injunctive relief.

5                  **PARTIES AND JURISDICTION**

6      9.     Plaintiff Bell is an individual and a citizen of Little Rock, Arkansas.  On
7  or about May 21, 2012, Plaintiff Bell purchased Diablo III, a video game
8  manufactured by Defendant Blizzard Entertainment, Inc.  On or about May 21, 2012,
9  he obtained an account with Battle.net, a website which is owned and administered by
10 Blizzard Entertainment, Inc.  Plaintiff Bell has maintained his Battle.net account since
11 that time, keeping said account continually active through the present.  At all times
12 relevant to this litigation, Plaintiff Bell's Battle.net account has operated on
13 Defendants' North American servers, and was thus one of the accounts compromised
14 in the data breach occurring on or about August 4, 2012.  Plaintiff's Private
15 Information was compromised as a result of said data breach, described herein.
16 Plaintiff Bell has not purchased or otherwise acquired a Battle.net Authenticator.
17 Plaintiff Bell does not use Defendants' Massively Multiplayer Online Role Playing
18 Game products.  To date, Plaintiff Bell has not received any form of notice from
19 Defendants regarding the data breach occurring on or about August 4, 2012, and has
20 instead learned of the compromise of his Private Information through third-party
21 sources.

22     10.    Plaintiff Spellman is an individual and a citizen of Los Angeles,
23 California.  Plaintiff Spellman owns video games manufactured by Defendants in all
24 of Defendants' franchises: Diablo, StarCraft, and World of Warcraft.   Plaintiff
25 Spellman has owned games in the World of Warcraft franchise (Defendants'
26 Massively Multiplayer Online Role Playing Game) since November, 2004; has owned
27 games in the StarCraft franchise since July, 2010; and has owned games in the Diablo
28 franchise since on or about May 15, 2012.  Since at least November, 2004, Plaintiff

Spellman has held an account with Battle.net, a website which is owned and administered by Blizzard Entertainment, Inc.  Plaintiff Spellman has maintained his Battle.net account since that time, keeping said account continually active through the present.  At all times relevant to this litigation, Plaintiff Spellman's Battle.net account has operated on Defendants' North American servers, and was thus one of the accounts compromised in the data breach occurring on or about August 4, 2012.  Plaintiff Spellman's Private Information was compromised as a result of said data breach described herein.   Plaintiff Spellman owns at least two Battle.net Authenticators, including a Mobile Authenticator and a Key Ring Authenticator.  To date, Plaintiff Spellman has not received any form of notice from Defendants regarding the data breach occurring on or about August 4, 2012, and has instead learned of the compromise of his Private Information through third-party sources.

11.     Defendant Blizzard Entertainment, Inc. ("Blizzard" or the "Company") is a Delaware corporation headquartered in Irvine, California.  Blizzard is a video game developer and publisher.

12.     Defendant Activision Blizzard, Inc. ("Activision Blizzard") is the American holding company for multiple game-publishing entities, including Blizzard.  Activision Blizzard, Inc. is a Delaware corporation, with headquarters in Santa Monica, California.

13.     The Court has subject matter jurisdiction over this nationwide class action pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5,000,000.00, exclusive of interest and costs, and is a class action in which some members of the Class are citizens of states different than Defendants.  *See* 28 U.S.C. § 1332(d)(2)(A).   The Court has personal jurisdiction over Defendants because they own and operate businesses that are headquartered in California and conduct substantial business throughout California.

14.     Venue properly lies in this district pursuant to 28 U.S.C. § 1391(b)(1).

1  All Defendants in this action – Defendant Blizzard Entertainment, Inc. and Defendant

2  Activision, Inc. – are headquartered in this district.

3        15.     Venue is also proper in this district pursuant to Defendants' Dispute

4  Resolution Policy, which is part of Defendants' Terms of Use and End User License

5  Agreement with Plaintiffs, and which states that all court proceedings arising out of

6  disputes between Plaintiffs and Defendants "shall be decided by a court of competent

7  jurisdiction within the County of Los Angeles, State of California, United States of

8  America, and you and Blizzard agree to submit to the personal jurisdiction of that

9  court."

10       16.     Delaware's law governs the substantive legal issues in the instant matter,

11  as Defendants' Dispute Resolution Policy, incorporated by reference into all

12  agreements entered into between Plaintiffs and Defendants, expressly provides that

13  Delaware law will govern the Agreement and claims arising from the Agreement.

14  Dispute Resolution Policy at § 6, "Governing Law."  Defendants, as drafters of the

15  Agreement, should be bound by their own terms.

16                          **FACTUAL BACKGROUND**

17       17.     Defendant Blizzard is an American video game developer and publisher,

18  headquartered in Irvine, California.   Among the video game titles that Blizzard

19  publishes and markets are Diablo, Diablo II, Diablo III, and related expansion packs[1]

20  (collectively, the "Diablo franchise"); StarCraft, StarCraft II, and related expansion

21  packs (collectively, the "StarCraft franchise"); and World of Warcraft and related

22  expansion packs (collectively, "World of Warcraft").   Costs for the software of the

23  underlying game and related expansion packs typically range in price from $14.99-

24  $59.99, although collector's edition versions of the games cost close to $200.00.[2]

25
26
27
28

[1] An "expansion pack" is a supplement to an already purchased video game, providing players with an extended storyline, along with new characters, objects, and related content.  The cost of an expansion pack is usually less than the underlying video game, as are the costs associated with manufacturing the product.  Ultimately, expansion packs serve as a way to extend the playing life of a video game, allowing companies to continue earning revenue on a franchise and allowing players to add hours of gameplay, all after the underlying game has been played all the way through.

[2] Amazon.com's list price for the Diablo III Collector's Edition is $179.99 (http://www.amazon.com/Diablo-III-Collectors-Edition-Pc/dp/B0050SZC5U/ref=sr_1_2?ie=UTF8&qid=1347373717&sr=8-2&keywords=diablo+III).  The list price for the collector's edition of StarCraft II: Wings of Liberty is $182.99 (http://www.amazon.com/Starcraft-II-

A.   **BATTLE.NET ACCOUNTS: CUSTOMERS' PRIVATE INFORMATION BECOMES A REQUISITE OF GAME PLAY; HIDDEN COSTS ARISE.**

18.   Beyond the development and publishing of its video game titles, Blizzard owns and administers Battle.net, a website that manages online accounts for Blizzard customers.  Defendants require customers to activate Battle.net accounts in order to play any of the games manufactured and sold by Defendants.

19.   However, Battle.net accounts only impact game functionality for World of Warcraft players, as this title is a "massively multiplayer online role-playing game" ("MMORPG"), which is played on a computer with an internet connection, allowing players from different physical locations to interact with each other within a virtual game world.  Battle.net accounts do not have any bearing on the functionality of games in either the StarCraft or Diablo franchises, as neither of those titles are MMORPGs, and would neither in theory nor in practice require either an internet connection or ancillary Battle.net account in order to be played.

20.   Instead, the *chief* function of a Battle.net account is to provide Defendants access to account holders' Private Information and to facilitate the purchase of Defendants' additional products and services.  Battle.net accounts offer a feature called "Battle.net Balance," which allows account holders to add funds via their credit or debit cards to their Battle.net accounts, which in turn may be used to purchase goods and services from Defendants.[3]  Most recently, Blizzard has further monetized Battle.net by establishing a "Real Money Auction House" ("RMAH") in the Diablo franchise, in which players can spend their Battle.net Balance for in-game items like weapons, armor, or "commodities" like gold and gems.[4]  Blizzard charges transaction fees of $1.00 (USD) for each auction of equipment like weapons and armor, and charges a 15% transaction fee for sales of commodities.

Liberty-Collectors-Edition-Pc/dp/B002I0JMB8/ref=pd_sim_vg_4)
[3] http://us.battle.net/support/en/article/battle-net-balance-faq#purchase
[4] http://us.battle.net/support/en/article/diablo-iii-auction-house-general-information

6

1

**1.** **Step One in Establishing a Battle.net Account: Relinquishing**

2

**Personal and Financial Data.**

3

21. In order to obtain a Battle.net account, a customer must provide sensitive

4 Private Information included, but not limited to, his or her full name, date of birth, and

5 e-mail address.[5] Additionally, the customer must choose a "secret question," to which

6 he or she provides an answer. The options for the account holder's "secret question"

7 are not customizable, and instead consist of generic choices that are the standard

8 questions used by other, popular websites: "First elementary school I attended;" "The

9 high school I graduated from;" "Your city of birth;" "Name of your first pet;" "Your

10 favorite sports team," among others.

11

22. Where customers obtain a Battle.net Balance to purchase products and

12 services through the website or to utilize the RMAH, they are prompted to enter even

13 more Private Information, including their credit card number, credit card expiration

14 date, billing address, and phone number. All of this information remains stored in the

15 Battle.net account.

16

23. Defendants make assurances to Battle.net account holders that this

17 Private Information will remain completely secure. Specifically, the Battle.net Terms

18 of Use agreement ("Agreement") requires, as part of its terms, that account holders

19 agree to be bound by Defendants' Privacy Policy. Battle.net Terms of Use at § 3,

20 "Requirements."

21

24. Defendants' Privacy Policy states, in pertinent part:

22

**How Secure is My Personal Information?** Blizzard has taken steps

23

to assure that all information collected will remain secure and in its

24

original form, *i.e.*, free from any alteration. As such, access to all

25

Personal Information is strictly controlled. When credit card

26

information is transmitted, for example, we use industry standard,

27

SSL (secure sockets layer) encryption. In addition, we will take

28

---

[5] https://us.battle.net/account/creation/tos.html

reasonable steps to assure that third parties to whom we transfer any data will provide sufficient protection of Personal Information.  We will retain your information for as long as needed to provide you services.[6]

       **2.**      **Step Two in Establishing a Battle.net Account:  Paying Additional, Hidden Costs to Protect One's Private Information.**

25.    While Defendants do inform customers, on the video game's box, that Battle.net accounts are required in order to play any of Defendants' titles, it is not until after a customer purchases the video game and establishes a Battle.net account that he or she learns that it is also necessary to purchase an additional product in order to ensure adequate security of the Private Information stored in the Battle.net account and to access certain features of game play. Specifically, customers learn that they must purchase a product called a Battle.net Authenticator ("Authenticator").  In the Battle.net Terms of Use agreement ("T.O.U."), section 6, subsection B, in all caps, customers are informed that "IN ORDER TO USE THE BATTLE.NET BALANCE FEATURE, YOU MUST ATTACH A BATTLE.NET AUTHENTICATOR TO YOUR ACCOUNT" (available at http://us.blizzard.com/en-us/company/about/termsofuse.html).

26.    Introduced in 2008,[7] an Authenticator is a device that generates a random code, which Battle.net account holders are prompted to enter in addition to their password.  "By using an authenticator," Blizzard promises, "access to a Battle.net account is restricted to only individuals with the authenticator code, helping prevent unauthorized access."[8]

27.    Authenticators come in two varieties:  a physical, keychain authenticator ("Key Ring Authenticator") and an authenticator app that is downloadable onto a

---

[6] http://us.blizzard.com/en-us/company/about/privacy.html
[7] Daniel Whitcomb, *Blizzard Authenticator to be Introduced at the Worldwide Invitational*, WoW Insider (June 26, 2008) (available at http://wow.joystiq.com/2008/06/26/blizzard-authenticator-to-be-introduced-at-the-worldwide-invitat/)
[8] https://us.battle.net/support/en/article/battlenet-authenticator

customer's smart phone ("Mobile Authenticator").  The Key Ring Authenticator costs $6.50,[9] while the cost for a Mobile Authenticator varies depending upon the mobile device.[10]  Upon information and belief, as of December, 2011, Defendants generated $26 million on Authenticator sales.[11]

28.     Ultimately, as discussed in paragraph 37, *infra*, the $6.50 Key Ring Authenticator is currently the only viable option for maintaining account security, as the security of the Mobile Authenticators was compromised following a Battle.net data breach occurring on or about August 4, 2012.   Thus, any of Defendants' customers who wish to (1) use the entirety of the features available in the video game that they purchased, and (2) protect the Private Information stored in their mandatory Battle.net accounts, must pay further, undisclosed, after-purchase costs of $6.50 for the Key Ring Authenticator.

**B.     BATTLE.NET ACCOUNTS ARE REPEATEDLY COMPROMISED, JEOPARDIZING ACCOUNT HOLDERS' PRIVATE INFORMATION.  DEFENDANTS BLAME THE CUSTOMERS, TELLING THEM TO SPEND MORE MONEY TO ENSURE ACCOUNT SECURITY.**

**1.     Battle.net Accounts are Hacked on May 19, 2012; Defendants Admit That "Players Have Been Seeing This For Five Years Or So".**

29.     On or about May 19, 2012, Blizzard began to receive reports from players of the Diablo franchise that their Battle.net accounts were being hacked, with items such as gold and characters going missing from the customers' accounts.[12]  The phenomenon was widespread, and profoundly upsetting to players, who had seen tens

[9] http://us.blizzard.com/store/details.xml?id=1100001981
[10] https://us.battle.net/support/en/article/battle-net-mobile-authenticator-faq. *See* Subsection "Why does the Battle.net Mobile Authenticator cost different amounts for different mobile devices?"
[11] Matthew Humphries, *Blizzard Has Made $26 Million Just From Battle.net Authenticators*, Geek.com (Dec. 30, 2011) (available at http://www.geek.com/articles/games/blizzard-has-made-26-million-just-from-battle-net-authenticators-20111230/)
[12] Nathan Grayson, *Shout at the Devil: Blizzard Aware of Diablo III Hacks.* Rock, Paper, Shotgun. (May 21, 2012) (available at http://www.rockpapershotgun.com/2012/05/21/shout-at-the-devil-blizzard-acknowledges-diablo-iii-hacks/).

9

or even hundreds of hours' worth of game play erased, with one commentator likening it to "walking into your house after a robbery."[13]

30.     Responding to angry customers, one of Defendants' support agents, Kaltonis replied that these security breaches in Battle.net accounts for the Diablo franchise were "no different than what World of Warcraft players have been seeing *for five years or so.*"[14] (emphasis added).  Kaltonis went on to say that the fix for this problem was the purchase of an Authenticator, stating "[i]f you have the physical or mobile authenticator (both of which major banks use and charge $30+ for) the chances of you being compromised are very, very small."

31.     Thus, instead of responding by fixing their internal security protocols, as promised in Defendants' Privacy Policy, *supra*, or by taking *any* remedial measures that did not result in increased costs to account holders, Defendants first told customers that these problems were systemic, and had been going on for five years, and then told their customers that the only way to keep their accounts secure was through the additional purchase of an Authenticator to the Battle.net account. Defendants' official response to customers, posted on their website on May 21, 2012, conceded:

> Historically, the release of a new game -- such as a World of Warcraft® expansion -- will result in an increase in reports of individual account compromises, and that's exactly what we're seeing now with Diablo III.  We know how frustrating it can be to become the victim of account theft, and as always, we're dedicated to doing everything we can to help our players keep their Battle.net accounts safe -- and we appreciate everyone who's doing their part to help protect their accounts as well.

---

[13] Paul Tassi, *The Horror of Being Hacked in Diablo 3*, Forbes (May 30, 2012) (available at http://www.forbes.com/sites/insertcoin/2012/05/30/the-horror-of-being-hacked-in-diablo-3/).
[14] William Usher, *Blizzard Admits Accounts with Authenticators Have Been Hacked*, Gaming Blend (May 25, 2012) (available at http://www.cinemablend.com/games/Blizzard-Admits-Accounts-With-Authenticators-Have-Been-Hacked-42909.html).

\*\*\*

We also wanted to reassure you that the Battle.net Authenticator and Battle.net Mobile Authenticator (a free app for iPhone and Android devices) continue to be some of the most effective measures we offer to help players protect themselves against account compromises, and we encourage everyone to take advantage of them.[15]

32.    In all subsequent discussions of the hack, Defendants consistently returned to the refrain, equating Authenticators with account security.  For instance, Defendants' community manager, Bashiok responded to complaints on a Battle.net forum by stating, "We have yet to investigate a compromise report in which an authenticator was attached beforehand."[16]

33.    Defendants also created a "security checklist" for players, which reads in the following order:

- ***Add a Battle.net Authenticator to your account.  Seriously.***
- Update your browser to the latest version.
- Activate your browser's phishing filter.
- Make sure your registered email address is secure and up-to-date.
- Make sure your computer operating system is up-to-date.
- Make sure your browser plug-ins and other commonly used applications are up-to-date.
- Install anti-virus software.
- Learn to identify common types of account theft.
- Keep in mind the list of safe, official Blizzard Entertainment domains.[17]

(Emphasis added).   Thus, beyond telling Class members to tighten up their *own* internet security protocols in order to keep their accounts safe, Defendants' very first

---

[15] http://us.battle.net/d3/en/forum/topic/5149619846#1
[16] Kevin Parrish, *Blizzard Responds to Diablo 3 Account Hack*, Tom's Hardware (May 22, 2012) (available at http://www.tomshardware.com/news/Diablo-3-Authenticator-Battle.net-Bashiok-Password,15724.html).
[17] http://us.battle.net/en/security/checklist

11

1    remedial measure suggested was, "seriously," to buy an additional product from
2    Defendants: an Authenticator.

3          34.    Customers were understandably enraged that Defendants placed the onus
4    for account security on the victim of the security breach.   An article in Forbes
5    magazine, decrying this practice, noted:

6               [I]f the authenticator is the end-all, be-all of keeping your account
7               safe, then shouldn't it be standard with every new account made?
8               Blizzard tries to sell the physical product at cost, but it seems like it
9               should be included in every box copy, or required as a free download
10              if it truly is the final answer to keep an account safe. If a $5 keyfob
11              [sic] is what it takes to make their game secure, Blizzard should be
12              eating that cost, not the player.[18]

13                    **2.     Defendants' Largest Breach To Date:  August 4, 2012.**

14         35.    The need for increased account security was driven home again 2 months
15   later, on or about August 9, 2012, with media outlets reporting that Blizzard had
16   revealed on its company website[19] that account details for millions of customers had
17   been stolen by hackers, as a result of an attack on Battle.net.[20]   While Defendants'
18   post made no mention of the date of the attack, news reports state that Blizzard was
19   aware of the data breach as early as August 4, 2012.[21]

20         36.    Concerning the scope of compromised customer data, the Company
21   stated that "for players on North American servers (which generally includes players
22   from North America, Latin America, Australia, New Zealand, and Southeast Asia),"
23   the hackers had gained access to email addresses, answers to personal security
24   questions, and "cryptographically scrambled versions of Battle.net passwords."[22]

25
26   ---
     [18] Paul Tassi, *For Diablo 3 Hacking, the Buck Stops Where?*, Forbes (May 31, 2012) (available at
     http://www.forbes.com/sites/insertcoin/2012/05/31/for-diablo-3-hacking-the-buck-stops-where/).
     [19] http://sea.blizzard.com/en-sg/securityupdate.html
27   [20] *Blizzard Battle.net Hack Attack Hits Millions*, BBC (Aug. 10, 2012) (available at
     http://www.bbc.com/news/technology-19207276).
28   [21] Kyle Orland, *Hackers Collect Significant Account Details From Blizzard Servers*, Ars Technica (Aug. 9, 2012)
     (available at http://arstechnica.com/gaming/2012/08/hackers-collect-significant-account-details-from-blizzard-servers/).
     [22] http://sea.blizzard.com/en-sg/securityupdate.html

                                                    12

37.     Additionally, Defendants stated that "[w]ith regard to Mobile Authenticators, information was taken that could potentially compromise the integrity of North American Mobile Authenticators."[23]  Thus, as a result of this data breach, in order to be assured of *any* modicum of security through the use of an Authenticator, a consumer would be burdened by the additional expense of a Key Ring Authenticator, on top of any money already spent on a now worthless Mobile Authenticator.

38.     In its Battle.net post, Blizzard stated that "Based on what we currently know, this information alone is NOT enough for anyone to gain access to Battle.net accounts."[24]

39.     This proposition was immediately challenged, however.  Within 24 hours of Blizzard's statement, one tech industry executive published a series of pieces explaining that the Company's mechanism for protecting users' passwords—Secure Remote Password protocol ("SRP")—was insufficient.[25]   Specifically, the author noted that the SRP server-side verifier database ("verifier database") was also stolen in the hack.

40.     Where thieves possess (1) an encrypted version of the password and (2) the verifier database, they will be able to employ what is known as a "dictionary attack," which effectively cross-checks the password against all likely possibilities from an exhaustive list of possible values (called a "dictionary").

41.     The author of the pieces stated that, based upon the data obtained in the Battle.net hack, each password could be individually attacked at a rate of 100,000 guesses per second.  By this estimate, the thieves could "reasonably check 100,000 of their top passwords against 400,000 usernames, per day," and accordingly "[s]ince the attack occurred, millions of users' passwords have likely already been cracked."[26]

---

[23] https://us.battle.net/support/en/article/important-security-update-faq
[24] *Id.*
[25] Jeremy Lippman, *SRP Won't Protect Blizzard's Stolen Passwords* (Aug. 9, 2012) (available at http://www.opine.me/blizzards-battle-net-hack/); *See also* Dan Goodin, *Why Hacked Blizzard Passwords Aren't as Hard to Crack as Company Says*, Ars Technica (Aug. 13, 2012) (available at http://arstechnica.com/security/2012/08/hacked-blizzard-passwords-not-hard-to-crack/).
[26] Jeremy Lippman, *SRP Won't Protect Blizzard's Stolen Passwords* (Aug. 9, 2012) (available at http://www.opine.me/blizzards-battle-net-hack/)

13

42.     Beyond obtaining users' passwords via dictionary attacks, a prospective identity thief could use a much simpler technique known as "phishing," in which the thief sends an email that looks like an official communication from the hacked company (in this case, Blizzard), seeking verification of a password or other sensitive information like a credit card number.  The unsuspecting recipient believes that they are simply updating information at the request of the company, when in fact they are providing a data thief with sensitive, Private Information.  Numerous news outlets and publications dedicated to web security have stated that the Battle.net data breach puts Blizzard customers at dramatically increased risk of phishing attacks targeting the compromised email addresses.[27]

43.     Whether obtaining access to customer accounts via dictionary attacks on stolen passwords or through phishing attacks on stolen e-mails, hackers *have* obtained illegal access to Battle.net accounts, following the data breach of August 4, 2012. Blizzard's customer support service ("Customer Support"), which maintains a Twitter feed that makes customer service requests viewable over the Web, reveals that multiple conversations occurred between Battle.net account holders and Customer Support, where account holders have been locked out of their accounts following the August 4, 2012 data breach (see attached Exhibit A).  In many of these exchanges, Customer Support acknowledges the account being "compromised," and also acknowledges the data breach.

44.     Similarly, since the August 4, 2012 data breach, customers have posted, on forums throughout the Internet, comments to the effect that their Battle.net accounts have been frozen or otherwise stolen as a result of the breach.[28]

**B.     IN ITS POST-DATA-BREACH ACTIONS, BLIZZARD HAS**

---

[27] *See, e.g.,* Todd Kenreck, *Blizzard's Network of More Than 10 Million Hacked,* NBC News (Aug. 10, 2012) (available at http://www.nbcnews.com/technology/ingame/blizzards-network-more-10-million-hacked-933846); *Online Entertainment Caught in Blizzard of Hacks,* Simply Security (Aug. 17, 2012) (available at http://www.simplysecurity.com/2012/08/17/online-entertainment-caught-in-blizzard-of-hacks/); Charles Arthur, *Diablo and World of Warcraft Players Warned Over Battle.net Hacking,* The Guardian (Aug. 10, 2012) (available at http://www.guardian.co.uk/technology/2012/aug/10/diablo-world-of-warcraft-hacking).
[28] *See, e.g.,* http://www.reddit.com/r/gaming/comments/ybx48/my_battlenet_account_was_stolen_does_anyone_have/

**FAILED   TO   PROVIDE   MEANINGFUL   WARNING   TO BATTLE.NET ACCOUNT HOLDERS.**

45.   Upon information and belief, the only affirmative steps that Blizzard has taken to inform Battle.net account holders that their Private Information has been stolen are confined to posts on Blizzard's website (and not Battle.net).   Upon information and belief, Battle.net account holders have not been notified via phone, email, letter or any other medium that their accounts have been compromised and their information has been stolen.   Instead, the massive, continent-spanning data breach, resulting in the theft of Private Information of millions of people, was merely announced as a post on Defendants' website – a location to which few, if any, of its customers would travel.

46.   Further, upon information and belief, for a period of time following the August 4, 2012, data breach, a customer who logged in to his or her Battle.net account could not even change his or her account details.  As detailed in attached Exhibit B, as of 12:53 PM, CST, August 28, 2012, where a customer logged in to the Battle.net website, and attempted to access account information (including Private Information), the user was redirected to a screen that read "We'll be back soon! The Blizzard family of websites is currently undergoing maintenance to improve your browsing experience.  Thank you for your patience!" followed by a prompt to follow Blizzard on Twitter, a popular social media website.

47.   Accordingly, unless a Blizzard customer either stumbles across a news story detailing the data breach or Blizzard's post on his or her own, or attempts to log in to an account that has already been hacked, he or she will have had *no notice* that Private Information has been stolen.

48.   Moreover, where a Blizzard customer did learn of the attack on Battle.net, and wished to change the details of his or her account in order to remove credit card information or other sensitive data, the Company had made that impossible due to its "maintenance to improve [the] browsing experience," at least as late as

August 28, 2012.   It should be noted that, at some point between August 28 and September 6, 2012, Battle.net accountholders were finally able to amend the Private Information in their accounts.

49.   Accordingly, for a significant period following the August 4, 2012 data breach, until some point between August 28 and September 6, 2012, *a customer could take no affirmative steps to protect his or her personal and financial information, as a result of Defendants' actions*.

**C.   <u>DEFENDANTS' ACTIONS HAVE HARMED PLAINTIFFS AND CLASS MEMBERS.</u>**

50.   At all relevant times, Plaintiffs have owned games manufactured by Defendants and have had Battle.net accounts.

51.   Defendants have consistently misrepresented the quality and reliability of the Battle.net website, along with their ability to keep the Private Information of Plaintiffs and Class members secure.   Such misrepresentations include, *inter alia*, statements made in Defendants' Privacy Policy, provided at the point of purchase of Defendants' video games.

52.   Upon information and belief, Defendants have failed, at all times relevant to this litigation, to disclose to Plaintiffs and Class members prior to the point of sale the necessity of a post-point-of-sale purchase of an Authenticator, at $6.50, for purposes of using the Battle.net Balance feature of their Battle.net accounts, for ensuring the security of the Private Information in their Battle.net accounts, or for any other purpose.

53.   Upon information and belief, Defendants failed to maintain proper security protocols to prevent the theft of Private Information of Class members.

54.   Upon information and belief, Defendants had been placed on notice that Battle.net was vulnerable to widespread hacking since as early as 2007, according to statements made by Defendants' employee, Kaltonis.   *See* paragraph 27, *supra*.

55.   Despite having five years' notice of account vulnerabilities, Defendants

*continued* to fail to take adequate security precautions, resulting in a massive data breach on or about August 4, 2012, at which point the Private Information of Plaintiffs and Class members was again compromised.

56.    Further, Defendants have duplicitously failed to alert Plaintiffs and Class members of, at the minimum, the data breach occurring on or about August 4, 2012. Upon information and belief, Defendants have not provided notice, either in written, telephonic, or electronic form, to any of their customers, including Plaintiffs and Class members, alerting them to the breach.

57.    Moreover, upon information and belief, Defendants made it impossible to edit one's Battle.net account details, in turn making it impossible for an account holder, including Plaintiffs and Class members, to remove his or her credit card information (and thus take affirmative steps to actually protect Private Information).

58.    As discussed in paragraph 43, *supra*, upon information and belief, members of the Class have begun to experience losses from fraudulent use of the Private Information obtained as a result of the August 4, 2012 data breach.

59.    Defendants' deceptive and negligent behavior, engaged in wantonly, purposely, and recklessly, has put the Private Information of Plaintiffs and Class members at continual risk.   Such behavior, and its attendant consequences, has deprived Plaintiffs and Class members of the full value of all goods and services purchased from Defendants.   As the months have unfolded in 2012, and as the instances of reported security lapses mount, it becomes more and more evident that playing games manufactured by Defendants – games that can cost almost $200 – requires gambling with the sanctity and security of one's Private Information, including, but not limited to, one's name, address, and credit card information.   Any game, the playing of which is conditioned upon such a risk, becomes devalued.   As the data breaches mount, the value decreases further.

## CLASS ACTION ALLEGATIONS

60.    This action is brought on behalf of Plaintiffs, individually, and as a class

action, on behalf the following classes (collectively referred to as "the Class" or "Class")[29]

 a. **The Authenticator Class:** All residents of the United States who purchased a video game manufactured by Defendants, after the introduction of the Authenticator for post-sale purchase in 2008.

 b. **The August 4 Class:** All residents of the United States whose Private Information was stolen from the Defendants' Battle.net website as a result of the data breach on or about August 4, 2012.

61. The Class does not include Defendants, or their officers, directors, agents, or employees.

62. Plaintiffs reserve the right to modify or amend the definition of the Class before the Court determines whether certification is appropriate.

63. The members of the Class are so numerous that joinder is impractical. The Class consists of at least ten million members, the identity of whom, upon information and belief, is within the knowledge of Defendants and can be ascertained only by resort to Defendants' records.

64. The representative Plaintiffs' claims are typical of the claims of the members of the Class in that (1) they, like all members of the Class, maintained Battle.net accounts prior to, during, and following the August 4, 2012, data breach, and had Private Information stolen as a result of Defendants' negligent, deliberate, and/or reckless behavior; and (2) purchased Defendants' video games and were not informed, at the point of sale, that an Authenticator would be required to either acquire a Battle.net Balance or ensure the security of the Private Information stored on their Battle.net accounts.

65. Questions of law and fact common to the Class predominate over questions that may affect individual Class members, including, *inter alia*:

---

[29] There is significant overlap between the Authenticator Class and the August 4 Class, as all of Defendants customers who maintained an active Battle.net account during the data breach occurring on or about August 4, 2012 are members of both classes.

a. Whether Defendants concealed and did not disclose at the point of purchase the fact that Plaintiffs and Class members would need make additional purchases, in the form of Authenticators;

b. Whether Defendants concealed and did not disclose the deficiencies in the security protocols of the Battle.net accounts of Plaintiffs and Class members;

c. Whether Defendants misrepresented their ability to protect Private Information contained the in Battle.net accounts of Plaintiffs and Class members;

d. Whether Defendants failed to provide reasonable notification to Battle.net account holders, alerting them of the August 4, 2012 data breach;

e. Whether Defendants' conduct constitutes an unfair and/or deceptive trade practice;

f. Whether Defendants' conduct constitutes a breach of its contract with Plaintiffs and Class members;

g. Whether Defendants owed a duty to Plaintiff and/or the Class to protect their Private Information;

h. Whether Defendants took reasonable measures to safeguard consumers' Private Information;

i. Whether Defendants were negligent in collecting and storing the Private Information of Plaintiffs and Class members;

j. Whether Defendants were negligent in failing to keep Plaintiff and Class members' Private Information secure;

k. Whether Defendants breached their duty to exercise reasonable care in storing consumers' Private Information by storing that information on their computer systems and in their physical possession;

l. Whether Defendants breached a duty by failing to keep Plaintiff and

19

1           Class members' Private Information secure;

2    m.    Whether Plaintiff and members of the Class have sustained damages, and

3           if so, what is the proper measure of those damages; and

4    n.    Whether injunctive relief is appropriate in this matter.

5    66.   Plaintiffs will fairly and adequately represent and protect the interests of

6    the Class, in that they have no interest that is antagonistic to, or that irreconcilably

7    conflicts with, those of other members of the Class.

8    67.   Plaintiffs have retained counsel competent and experienced in the

9    prosecution of class action litigation.

10   68.   A class action is superior to all other available methods for the fair and

11   efficient adjudication of Plaintiffs' and the Class members' claims.  Plaintiffs and the

12   members of the Class have suffered irreparable harm as a result of Defendants'

13   deceptive, intentional, reckless, negligent, and unlawful conduct.   The damages

14   suffered by individual Class Members may be relatively small, and thus few, if any,

15   individual class members can afford to seek legal redress on an individual basis for the

16   wrong complained of herein.  Absent a class action, Plaintiffs and members of the

17   Class will continue to suffer losses as a result of Defendants' unlawful and negligent

18   conduct.

19                              **COUNT I**

20   **Violation of Delaware's Consumer Fraud Act ("CFA") 6 Del. C. § 2511 *et seq.***

21                    **(On Behalf of the Authenticator Class)**

22   69.   Plaintiffs repeat all paragraphs above.

23   70.   The goods and services provided by Defendants to Plaintiffs and all other

24   Authenticator Class members constitute "merchandise" within the meaning of the

25   CFA.

26   71.   By reason of the conduct alleged herein, Defendants engaged in

27   violations of the CFA where they employed "deception, fraud, false pretense, false

28   promise, misrepresentation, or the concealment, suppression, or omission of any

---

material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise." 6 Del. C. § 2513(a).

72.    Defendants violated the CFA—and continue to violate the CFA—by failing to inform consumers, at the initial point of sale of Defendants' video games, that a Battle.net Authenticator is necessary to ensure any modicum of security for Battle.net accounts.   This amounts to an undisclosed, after-the-fact charge that consumers are required to pay, simply to prevent their Battle.net accounts from being hacked while they play video games for which they have already paid as much as $182.99.  If Battle.net account holders do *not* purchase these items, their Private Information is subjected to a drastically increased risk of being stolen, a fact that customers are made privy to only following the purchase of their games and the establishment of their Battle.net accounts.   On information and belief, over $26 million has been spent by class members on authenticators.

73.    Defendants violated the CFA—and continue to violate the CFA—by failing to disclose, at the point of purchase of the video games they manufacture and distribute, that in order to obtain a Battle.net account and actually use Defendants' games, the consumer must (1) provide Private Information, and (2) expose said Private Information to increased risk of theft unless the consumer makes a subsequent purchase of a Battle.net authenticator.

74.    Defendants' omissions, misrepresentations and other conduct induced Plaintiffs and Authenticator Class members to purchase Defendants' products under the assumption, at the point of sale, that no additional purchase of an Authenticator or any other product or service would be necessary to ensure the account security warranted by Defendants in, *inter alia*, Defendants' Privacy Policy.

75.    As a result of Defendants' violations of the CFA, Plaintiffs and all other Class members are entitled to compensatory damages and injunctive relief.

## COUNT II

### Violation of Delaware's Consumer Fraud Act ("CFA") 6 Del. C. § 2511 *et seq.*
### (On Behalf of the August 4 Class)

Plaintiffs repeat all paragraphs above.

76.    The goods and services provided by Defendants to Plaintiffs and August 4 Class members constitute "merchandise" within the meaning of the CFA.

77.    By reason of the conduct alleged herein, Defendants engaged in violations of the CFA where they employed "deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise." 6 Del. C. § 2513(a).

78.    Defendants violated the CFA—and continue to violate the CFA—by misrepresenting the quality of their security protocols for Battle.net, and by misrepresenting their ability to safely store customers' Private Information. Defendants stated, in Battle.net's Privacy Policy, that account holders could be "assure[d] that all information collected will remain secure" and that "access to all Private Information is strictly controlled." Defendants failed, however, to keep such information secure and strictly controlled, as evidenced not only by the data breach occurring on or about August 4, 2012, but also the account hacks occurring, by Defendants' own admission, as early as 2007.

79.    Defendants violated the CFA—and continue to violate the CFA—by failing to disclose, at the point of purchase of the video games they manufacture and distribute, that in order to obtain a Battle.net account and actually use Defendants' games, the consumer must (1) provide Private Information, and (2) expose said Private Information to increased risk of theft unless the consumer makes a subsequent purchase of a Battle.net authenticator.

80.    Defendants' omissions, misrepresentations and other conduct induced

Plaintiffs to obtain Battle.net accounts and to provide Private Information when registering for Battle.net accounts.   But for these actions, Plaintiffs and all other August 4 Class members would not have had their Private Information compromised, which event resulted in (1) the loss of the unencumbered use of their passwords; (2) the procurement, by hackers, of their Private Information without their consent; and (3) the inability to take steps to protect themselves and their Private Information.

81.   Defendants further violated the CFA—and continue to violate the CFA—by failing to immediately notify Plaintiffs and all other August 4 Class members of the August 4, 2012 data breach.   Moreover, to date, Defendants have taken no meaningful steps to alert Plaintiffs and all other August 4 Class members of the data breach.

82.   Such concealment and failure to act amounts to a violation of 6 Del. C. § 12B-101, *et seq*.

83.   Defendants are a "commercial entity," within the meaning of Delaware's data breach notification laws, as defined in 6 Del. C. § 12B-101.

84.   The data breach occurring on or about August 4, 2012, constituted a "breach of the security system" of Defendants, within the meaning of Delaware's data breach notification laws, as defined in 6 Del. C. § 12B-101.

85.   Under Delaware's data breach notification laws, where Defendants became aware that the Private Information of Plaintiffs and all other August 4 Class members had been compromised as a result of the data breach occurring on or about August 4, 2012, Defendants had a duty to give notice "as soon as possible" to all affected Battle.net account holders.   Upon information and belief, Defendants have failed, to date, to provide any notice to Plaintiffs and all other members of the August 4 Class, let alone to provide notice in a manner consistent with the requirements of 6 Del. C. § 12B-102(3).

86.   Defendants' violations of 6 Del. C. § 12B-101, *et seq*. have injured Plaintiffs and August 4 Class members by causing (1) the loss of the unencumbered

1   use of their passwords; (2) the procurement, by hackers, of their Private Information
2   without their consent; and (3) the inability to take steps to protect themselves and their
3   Private Information.

4          87.    Defendants' violations of 6 Del. C. § 12B-101, *et seq*. are also violations
5   of the CFA.  If Plaintiffs and all other August 4 Class members had been notified,
6   they could have taken precautions to safeguard their Private Information, at least until
7   Defendants froze account holders' ability to amend their Battle.net account details.
8   Since that moment, Defendants have affirmatively, materially impaired Plaintiffs' and
9   all other August 4 Class members' ability to protect their Private Information, and
10  have misrepresented the security of the goods and services they provided and continue
11  to provide to Plaintiffs and all other August 4 Class members.

12         88.    Defendants' violations of the CFA have put the Private Information of
13  Plaintiffs and Class members at continual risk.   Such behavior, and its attendant
14  consequences, has deprived Plaintiffs and Class members of the full value of all goods
15  and services purchased from Defendants.  As the months have unfolded in 2012, and
16  as the instances of reported security lapses mount, it becomes more and more evident
17  that playing games manufactured by Defendants – games that can cost almost $200 –
18  requires gambling with the sanctity and security of one's Private Information,
19  including, but not limited to, one's name, address, and credit card information.  Any
20  game, the playing of which is conditioned upon such a risk, becomes devalued.  As
21  the data breaches mount, the value decreases further.

22         89.    As a result of Defendants' violations of the CFA, Plaintiffs and all other
23  August 4 Class members are entitled to compensatory damages, including losses
24  sustained in the devaluation of games purchased by Plaintiffs from Defendants, as
25  well as injunctive relief.

26

27

28

## COUNT III

### Unjust Enrichment

### (On Behalf of the Authenticator Class)

90.   Plaintiffs repeat all paragraphs above.

91.   Plaintiffs and all other Authenticator Class members conferred benefits on Defendants by (1) paying for video games manufactured and developed by Defendants; and (2) signing up for Battle.net accounts.

92.   Plaintiffs and all other Authenticator Class members, however, were deprived of the full value of their video games, as well as their Battle.net accounts, due to Defendants' inability to ensure adequate protections for all Private Information entrusted to them by Plaintiffs and all other Authenticator Class members.

93.   Where Defendants have suffered data breaches as a result of their own lax security protocols, rather than shouldering the cost of remedying their own error, they required Plaintiffs and Authenticator Class members to purchase a new product – an Authenticator – at additional cost.  They did not provide the Authenticator for free or include it with future purchases.   Where they should have simply fixed their security protocols without burdening their customers with additional costs, they instead engaged in the extortionate practice of making Plaintiffs and all other Authenticator Class members pay more money for peace of mind.

94.   Defendants knowingly and willingly accepted monetary benefits resulting from Plaintiffs' and all other Authenticator Class members' purchases, but failed to honor their obligations to Plaintiffs and all other Authenticator Class members, specifically by failing to abide by the assurances made in their Privacy Policy that all Private Information would be secure, without the acquisition of an Authenticator.

95.   Under the circumstances described herein, it is inequitable for Defendants to retain these monetary benefits, derived from Plaintiffs and all other Authenticator Class members.

96.    By engaging in the conduct described above, Defendants have been unjustly enriched at the expense of Plaintiffs and all other Authenticator Class members.    Accordingly, it would be contrary to principles of equity and good conscience to permit Defendants to retain any ill-gotten monetary benefits obtained as a result of the actions described herein.

97.    As a result of Defendants' enrichment, Plaintiffs and all other Authenticator Class members have suffered injury and are entitled to reimbursement, restitution, and disgorgement by Defendants of the benefit conferred by Plaintiffs and all other Authenticator Class members.

## COUNT IV

### Unjust Enrichment

### (On Behalf of the August 4 Class)

98.    Plaintiffs repeat all paragraphs above.

99.    Plaintiffs and all other August 4 Class members conferred benefits on Defendants by (1) paying for video games manufactured and developed by Defendants; and (2) signing up for Battle.net accounts.

100.    Plaintiffs and all other August 4 Class members, however, were deprived of the full value of their video games, as well as their Battle.net accounts, due to Defendants' inability to ensure adequate protections for all Private Information entrusted to them by Plaintiffs and all other August 4 Class members.

101.    Defendants knowingly and willingly accepted monetary benefits resulting from Plaintiffs' and all other August 4 Class members' purchases, but failed to honor their obligations to Plaintiffs and all other August 4 Class members, specifically by failing to abide by the assurances made in their Privacy Policy that all Private Information would be secure.

102.    Where Defendants have predicated the ability to play their games on obtaining a Battle.net account, they have added a significant element of risk to each game; specifically, that a player will have his or her Private Information compromised

via a Battle.net data breach.  Such risk diminishes the value of the game over time, and each successive data breach diminishes a game's value in increasing magnitude. Defendants insist that customers rely on an unsafe website in order to enrich themselves, with the attendant effect of devaluing their customers' purchases.

103.   Where Defendants have refused to enact sufficient security protocols or to provide notice to customers when data breaches occur, such actions diminish the value of their games over time, and each successive data breach diminishes a game's value in increasing magnitude.  Defendants' actions devalue the substantial purchases made by Plaintiffs and members of the August 4 Class, in that they add an increasing and continual level of risk to the act of playing a video game.

104.   Under the circumstances described herein, it is inequitable for Defendants to retain these monetary benefits, derived from Plaintiffs and all other August 4 Class members.

105.   By engaging in the conduct described above, Defendants have been unjustly enriched at the expense of Plaintiffs and all other August 4 Class members. Accordingly, it would be contrary to principles of equity and good conscience to permit Defendants to retain any ill-gotten monetary benefits obtained as a result of the actions described herein.

106.   As a result of Defendants' enrichment, Plaintiffs and all other August 4 Class members have suffered injury and are entitled to reimbursement, restitution, and disgorgement by Defendants of the benefit conferred by Plaintiffs and all other August 4 Class members.

### COUNT V

#### Negligence *Per Se*

#### (On Behalf of the Class)

107.   Plaintiffs repeat all paragraphs above.

108.   Defendants had a duty to timely disclose any incidents of data breaches of Battle.net and Battle.net accounts, where such breaches compromised the Private

Information of Plaintiffs and Class members.

109.   Defendants breached their duty to timely disclose that the Private Information of Plaintiffs and Class members in their possession had been, or was reasonably believed to have been, stolen or compromised.

110.   Timely disclosure was appropriate so that, among other things, Plaintiffs and Class members could take appropriate measures to avoid unauthorized charges to their credit or debit card accounts; cancel or change usernames or passwords on both compromised accounts and personal accounts utilizing comparable personal or financial information; remove credit or debit card information from their Battle.net accounts; and monitor their account information and credit reports for fraudulent activity.

111.   But for Defendants' negligent and wrongful breach of their duties of notification owed to Plaintiffs and the Class, Plaintiffs and the Class could have taken remedial measures to protect their Private Information.

112.   As set forth in paragraphs 82-87, *supra*, Defendants' failure to provide timely notice to Plaintiffs and Class members of Battle.net data breaches are violations of 6 Del. C. § 12B-101, *et seq*., and are evidence of Defendants' negligence *per se*.

113.   Where Defendants have negligently failed to provide notice to customers when data breaches occur, such actions diminish the value of their games over time, and each successive data breach diminishes a game's value in increasing magnitude. Defendants' negligence devalues the substantial purchases made by Plaintiffs and members of the Class, in that they add an increasing and continual level of risk to the act of playing a video game.

114.   Plaintiff and the Class suffered actual damages including, but not limited to: expenses for credit monitoring, anxiety, emotional distress, loss of privacy; diminished value of their video game purchases; and other economic and non-economic harm.

## COUNT VI

### Negligence

### (On Behalf of the Class)

115.   Plaintiffs repeat all paragraphs above.

116.   Defendants came into possession of Plaintiffs' and Class members' Private Information and had a duty to exercise reasonable care in safeguarding and protecting such information from being compromised and/or stolen.

117.   Defendants further had a duty to have procedures in place to detect and prevent the theft or dissemination of the Private Information of Plaintiffs and Class members.   This breach of security and unauthorized access was reasonably foreseeable to Defendants, particularly in light of the Battle.net security breaches occurring since at least 2007.

118.   Defendants failed to exercise reasonable care in safeguarding and protecting the Private Information of Plaintiffs and Class members by failing to adopt, maintain, and/or implement adequate security measures to prevent data breaches.

119.   Defendants had a duty to timely disclose any incidents of data breaches of Battle.net and Battle.net accounts, where such breaches compromised the Private Information of Plaintiffs and Class members.

120.   Defendants breached their duty to timely disclose that the Private Information of Plaintiffs and Class members in their possession had been, or was reasonably believed to have been, stolen or compromised.

121.   Timely disclosure was appropriate so that, among other things, Plaintiffs and Class members could take appropriate measures to avoid unauthorized charges to their credit or debit card accounts; cancel or change usernames or passwords on both compromised accounts and personal accounts utilizing comparable personal or financial information; remove credit or debit card information from their Battle.net accounts; and monitor their account information and credit reports for fraudulent activity.

122.   As set forth in paragraphs 82-87, *supra*, Defendants' failure to provide timely notice to Plaintiffs and Class members of Battle.net data breaches are violations of 6 Del. C. § 12B-101, *et seq.*, and are evidence of Defendants' negligence.

123.   But for Defendants' negligent and wrongful breach of their duties owed to Plaintiffs and the Class, their Private Information would not have been compromised.

124.   But for Defendants' negligent and wrongful breach of their duties of notification owed to Plaintiffs and the Class, Plaintiffs and the Class could have taken remedial measures to protect their Private Information.

125.   Plaintiffs' and the Class's Private Information was compromised, viewed, and/or stolen as the proximate result of Defendants failing to exercise reasonable care in safeguarding such information by adopting, implementing, or maintaining appropriate security measures to protect and safeguard the private, non-public, personal and financial information within their possession.

126.   Where Defendants have negligently failed to enact sufficient security protocols or to provide notice to customers when data breaches occur, such actions diminish the value of their games over time, and each successive data breach diminishes a game's value in increasing magnitude. Defendants' negligence devalues the substantial purchases made by Plaintiffs and members of the Class, in that they add an increasing and continual level of risk to the act of playing a video game.

127.   Plaintiff and the Class suffered actual damages including, but not limited to: expenses for credit monitoring, anxiety, emotional distress, loss of privacy; diminished value of their video game purchases; and other economic and non-economic harm.

## COUNT VII

### Breach of Contract

### (On Behalf of the Class)

128.   Plaintiffs repeat all paragraphs above.

129.   Defendants came into possession of Plaintiff's and the Class's Private Information due to their contractual relationship concerning Plaintiffs' and all other Class members' use of their Private Information, provided to Defendants in return for the ability to play video games developed and manufactured by Defendants, and to receive services via Battle.net. These contracts were based, among other terms, upon Defendants' ability to protect such information in a secure manner, as articulated in Defendants' Privacy Policy, *supra* at paragraph 24.

130.   Defendants did not safeguard and protect Plaintiffs' and the Class's Private Information from being compromised and/or stolen.   Indeed, Defendants allowed this information to be stolen.   Defendants subsequently failed to disclose to Plaintiff and the Class that their Private Information had been compromised and/or stolen.

131.   Because Defendants failed to safeguard the Private Information of Plaintiffs and the Class and to protect such information from being compromised and/or stolen, Defendants breached their contracts with the Plaintiff and the Class.

132.   Plaintiffs and the Class suffered actual damages including, but not limited to: costs of credit monitoring, diminished value of their video game purchases, anxiety, emotional distress, loss of privacy, and other economic and non-economic harm.

## COUNT VIII

### Bailment

### (On Behalf of the Class)

133.   Plaintiffs repeat all paragraphs above.

134.   Plaintiffs and all other Class members delivered and entrusted their Private Information to Defendants for the sole purpose of accessing and using their Battle.net accounts and, through such access, playing the video games they had purchased from Defendants.

135.   A bailment arises where possession, but not ownership, of property is

1   transferred from one party ("bailor") to another ("bailee").   Where a bailee has

2   received a bailment from a bailor, a duty of care is owed.  Typically, a bailee is strictly

3   liable for the bailment.

4          136.   During the period of bailment Defendants, as bailees, owed Plaintiffs and

5   all other Class members a duty of care to safeguard their Private Information by

6   maintaining reasonable security procedures and practices to protect such information.

7   As alleged herein, Defendants breached this duty.

8          137.   As a result of Defendants' breach of this duty, Plaintiffs and all other

9   Class members have been harmed as alleged herein.

10                              **PRAYER FOR RELIEF**

11          WHEREFORE, Plaintiffs seek judgment in favor of themselves and the Class

12   for the following:

13          A.     That the Court determine that this action may be maintained as a class

14                 action under Rule 23 of the Federal Rules of Civil Procedure, that

15                 Plaintiffs are proper class representatives; that counsel is adequate Class

16                 Counsel, and that the best practicable notice of this action be given to

17                 members of the Class represented by Plaintiffs;

18          B.     That judgment be entered against Defendant and in favor of Plaintiffs and

19                 the Class on all of the Causes of Action in this Complaint;

20          C.     That judgment be entered against Defendants for compensatory damages

21                 in an amount to be determined by a jury at trial, including, but not limited

22                 to, compensatory damages for the cost of an authenticator, the amount in

23                 which the game was devalued, the cost of monitoring Plaintiffs' and

24                 other Class members' financial accounts, and making Plaintiffs and the

25                 Class members whole;

26          D.     That judgment be entered against Defendants for relief in the form of

27                 restitution and disgorgement of Defendants' unjustly-realized enrichment

28                 in an amount to be determined by a jury at trial;

E.    That judgment be entered against Defendants for injunctive and equitable relief, including, but not limited to:   (a) enjoining Defendants from tacking on additional, undisclosed costs to ensure security in the form of a post-point-of-sale Authenticator; (b) enjoining Defendants from requiring customers to acquire a Battle.net account (and thereby risking the security of their Private Information) for game titles that are not MMORPGs, such as the StarCraft or Diablo franchises; and (c) enjoining Defendants from actions which place consumers at a risk of future security breaches;

F.    That judgment be entered against Defendant imposing interest on damages;

G.    That judgment be entered against Defendant imposing litigation costs and attorneys' fees; and

H.    For all other and further relief as this Court may deem necessary and appropriate.

Plaintiffs demand a jury trial on all issues so triable.

DATED:  November 5, 2012                      Attorneys for Plaintiffs Benjamin Bell,
                                              Christopher Spellman, and the Proposed
                                              Class


                                        By: _____

                                              CARNEY WILLIAMS BATES
                                              PULLIAM & BOWMAN, PLLC
                                              Hank Bates

                                              MILSTEIN ADELMAN, LLP
                                              Gillian L. Wade
                                              M. Isaac Miller

33

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Stephen V. Wilson and the assigned discovery Magistrate Judge is Patrick J. Walsh.

The case number on all documents filed with the Court should read as follows:

## CV12- 9475 SVW (PJWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===========================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] **Western Division** | [ ] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.



MILSTEIN ADELMAN, LLP
Gillian L. Wade, State Bar No. 229124
M. Isaac Miller, State Bar No. 266459
2800 Donald Douglas Loop North
Santa Monica, CA 90405
Tel: 310-396-9600

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

BENJAMIN BELL and CHRISTOPHER SPELLMAN,

PLAINTIFF(S)

v.

BLIZZARD ENTERTAINMENT, INC., a Delaware corp., and ACTIVISION BLIZZARD, INC., a Delaware corp.

DEFENDANT(S).

CASE NUMBER

**CV12-09475** SVW (PJW x)

**SUMMONS**

TO:   DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, _Gillian L. Wade_____, whose address is _2800 Donald Douglas Loop North, Santa Monica, CA 90405_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

NOV - 5 2012

Dated: _____

Clerk, U.S. District Court

By: _____

**JULIE PRADO**

Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

CV-01A (10/11)                **SUMMONS**



## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) <br> BENJAMIN BELL and CHRISTOPHER SPELLMAN, | DEFENDANTS <br> BLIZZARD ENTERTAINMENT, <br> INC., a Delaware corp., and ACTIVISION BLIZZARD, INC., a |
|---|---|
| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) <br><br> MILSTEIN ADELMAN, LLP , Gillian L. Wade/ M. Isaac Miller <br> 2800 Donald Douglas Loop North, Santa Monica, CA 90405 <br> Telephone: 310-396-9600 | Attorneys (If Known) |

| II. BASIS OF JURISDICTION (Place an X in one box only.) | | III. CITIZENSHIP OF PRINCIPAL PARTIES - For Diversity Cases Only <br> (Place an X in one box for plaintiff and one for defendant.) | | | | |
|---|---|---|---|---|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) | | PTF | DEF | | PTF DEF |
| | | Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4  ☑ 4 |
| ☐ 2 U.S. Government Defendant | ☑ 4 Diversity (Indicate Citizenship of Parties in Item III) | Citizen of Another State | ☑ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5  ☑ 5 |
| | | Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6  ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☑ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes  ☐ No   ☑ MONEY DEMANDED IN COMPLAINT: $ TBD at Trial

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Delaware's Consumer Fraud Act ("CFA") 6 Del. C. § 2511 et seq.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS <br> PERSONAL INJURY | TORTS <br> PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☑ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | **REAL PROPERTY** | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | ☐ 210 Land Condemnation | **IMMIGRATION** | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 220 Foreclosure | ☐ 462 Naturalization Application | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | | ☐ 230 Rent Lease & Ejectment | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | | ☐ 240 Torts to Land | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | | ☐ 245 Tort Product Liability | ☐ 463 Habeas Corpus-Alien Detainee | | **FEDERAL TAX SUITS** |
| ☐ 950 Constitutionality of State Statutes | | ☐ 290 All Other Real Property | ☐ 465 Other Immigration Actions | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | | | | | ☐ 871 IRS-Third Party 26 USC 7609 |

# CV12-09475

**FOR OFFICE USE ONLY:**   Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No  ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No  ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply) ☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles, California | Little Rock, Arkansas |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Delaware |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles, California | |

* **Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X.  SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date   November 5, 2012

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |